# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

LEAH MEGAN LANGLEY, INDIVIDUALLY
AND AS THE PERSONAL REPRESENTATIVE
OF THE ESTATE OF CHARRA LANGLEY

PLAINTIFF,

VERSUS * CIVIL ACTION NO.

BP EXPLORATION & PRODUCTION, *
   INC., A DELAWARE CORPORATION,
BP AMERICA PRODUCTION CO., * JUDGE BARBIER
   A DELAWARE CORPORATION,
TRANSOCEAN HOLDINGS, LLC., * MAG. JUDGE CURRAULT
   A DELAWARE CORPORATION,
TRANSOCEAN DEEPWATER, INC., *
   A DELAWARE CORPORATION,
TRANSOCEAN OFFSHORE *
   DEEPWATER DRILLING, INC.,
   A DELAWARE CORPORATION, *
HALLIBURTON ENERGY SERVICES,
   INC., A DELAWARE CORPORATION *

DEFENDANTS.

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, LEAH MEGAN LANGLEY, Individually and as the Personal

Representative to the ESTATE OF CHARRA LANGLEY ("Estate"); by and through the

undersigned counsel, and hereby brings this cause of action against BP Exploration & Production,

Inc. ("BP Exploration"), BP America Production Co. ("BP America"), Transocean Holdings, LLC

("Transocean Holdings"), Transocean Deepwater, Inc. ("Transocean Deepwater"), Transocean

Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Halliburton Energy Services, Inc.

("Halliburton"), hereinafter collectively referred to as ("Defendants"). Plaintiff alleges the following upon information and belief:

## INTRODUCTION

1. This is an action for the Defendants' negligence resulting in the Wrongful Death of Charra Langley ("Decedent").

2. Decedent's injuries and death were caused by exposure to toxic substances due to the BP *Deepwater Horizon* Oil Spill on April 20, 2010 ("BP Oil Spill").

## PARTIES
### *Plaintiff*

3. Plaintiff, LEAH MEGAN LANGLEY, is a natural person of the age of majority and is the surviving daughter of Decedent.

4. Survivor, ROBBIN KESSLER, is a natural person of the age of majority, and is the surviving daughter of Decedent.

5. Survivor, EMILY ALLISON, is a natural person of the age of majority and is the surviving daughter of Decedent.

6. Decedent was a citizen and resident of Elberta in Baldwin County, Alabama, and suffered permanent injuries that resulted in her death as a direct and proximate result, of her exposure to Defendants' toxic substances that were released from the BP Oil Spill.

7. Decedent was exposed to said harmful substances as a result of (i) where she lived during the relevant time period during the BP Oil Spill and (ii) engaging in recreational activities such as paddle boating, consuming potentially contaminated seafood and walking on the beach.

8. Decedent died on September 7, 2018 in Clarke county, Alabama, succumbing from the Metastatic Adenocarcinoma Consistent with Colorectal Primary (hereinafter "Metastatic

Colon Cancer"), she manifested due to her exposures to Defendants' toxic chemicals and dispersants.

## Defendants
### *BP Exploration*

9. BP Exploration is a Delaware corporation with its principal place of business located in Houston, Texas.

10. BP Exploration was a leaseholder and performed oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, (hereinafter the "Macondo Well") where the oil spill originated.

11. BP Exploration was designated as a "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.

12. BP Exploration purposely availed itself of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill including, but not limited to:

    i.   Managed clean-up and/or response activities in or around the shores of Alabama, Louisiana, Mississippi, Florida and Texas (hereinafter "Gulf States"), at all relevant times;

    ii.   Pumped crude oil that ended up throughout the coasts of the Gulf States;

    iii.   Directed and participated with Unified Command, contracting with various clean-up crew companies throughout the Gulf States; and

    iv.   Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

### *BP America*

13. BP America is a Delaware corporation with its principal place of business in Houston, Texas.

3

14. BP America was a party to the drilling contract with Transocean Holdings for the drilling of the Macondo Well.

15. BP America purposely availed itself of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill including:

    i.   Managed clean-up and/or response activities in or around the Gulf States at all relevant times;

    ii.   Pumped crude oil that ended up all throughout the coasts of the Gulf States;

    iii.   Directed and participated with Unified Command, contracting with various clean-up crew companies throughout the Gulf States; and

    iv.   Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

16. BP America and BP Exploration will hereinafter collectively be referred to as "BP Defendants."

### *Transocean*

17. Transocean Holdings, Transocean Deepwater, and Transocean Offshore are Delaware corporations (hereinafter referred to collectively as "Transocean Defendants") with their principal place of business located in Houston, Texas.

18. Transocean Defendants purposely availed themselves of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill, including:

    i.   Engaging in clean-up and/or response activities in or around the Gulf States at all relevant times;

    ii.   Manned and guided the Deepwater Horizon Rig ("DHR"), which exploded while

pumping crude oil, resulting in the mass discharge and prolonged seepage of crude oil throughout the coasts of the Gulf States;

iii. Directed and participated with Unified Command, contracting with various disaster response companies which supplied the clean-up workers tasked with removing and/or collecting oil from the beaches and shores of the Gulf States; and

iv. Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that included petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

### *Halliburton*

19. Halliburton is a Delaware Corporation with its principal place of business in Houston, Texas.

20. Halliburton purposely availed itself of the Court's personal jurisdiction by having manufactured, as a subcontractor for BP America and/or BP Exploration, a nitrogen foam cement slurry mixture (hereinafter "Cement Mixture"), to provide cementing and mudlogging services for the DHR.

### **JURISDICTION AND VENUE**

21. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a) because complete diversity of citizenship exists among the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

22. Additionally, this Court has Jurisdiction based on Federal Question under 28 U.S.C. §1331, in that Article III, Section 2 of the United States Constitution empowers the federal judiciary to hear "all cases of admiralty and maritime jurisdiction."

23. This Court also has jurisdiction pursuant to 28 U.S.C. §1333; as well as the Admiralty

Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."

24. This venue is proper for filing in this District pursuant to both 28 U.S.C. § 1407 and the Transfer Order of the Judicial Panel on Multidistrict Litigation, which allows Plaintiff to directly file complaints arising out of the BP Oil Spill in this District. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010); *See Also Pretrial Order No. 20* (Rec. Doc. 904).

25. Notwithstanding the above, the most appropriate venue in accordance with 28 U.S.C. §1391(b)(2) is the Southern District of Alabama. The death of Decedent occurred in the Southern District of Alabama. Moreover, Decedent, at all times relevant, was domiciled in and was exposed in the Southern District of Alabama. Finally, Decedent's witnesses and other relevant sources of proof are located in the Southern District of Alabama. Considering the relative ease of access to sources of proof, the ability to secure attendance of witnesses and the ability to minimize costs of witnesses, the appropriate venue for this cause of action is the Southern District of Alabama. Plaintiff seeks to have this matter transferred to the appropriate venue in the Southern District of Alabama.

26. All other prerequisites to file this action have been satisfied by Plaintiff.

## SUMMARY OF FACTS
### General Summary of Facts

27. Plaintiff incorporates all findings of facts and conclusions of law detailed in *Findings of Fact and Conclusions of Law - Phase One Trial* ("Phase One Findings"), MDL No. 2179, Rec. Doc. 13355, (E.D. La. Sept. 4, 2014).

28. Pursuant to Federal Law, Phase One Findings are binding as to all Defendants listed within this Complaint.

29. All injuries detailed within this Complaint arise from the same transaction and/or occurrence relating to the BP Oil Spill, *Deepwater Horizon* explosion and subsequent oil spill related events.

30. While crude oil was believed to be discharged before the *Deepwater Horizon* platform finally sank on April 22, 2010, the rate of discharge is believed to have increased once the Deepwater Horizon sank to the ocean floor.

31. After the explosion and sinking of the *Deepwater Horizon*, BP Defendants attempted to downplay and/or conceal the severity the BP Oil Spill. Its initial leak estimate of 1,000 barrels of oil per day was found by government investigators to be a fraction of its measured leakage amount of 50,000 barrels per day. Moreover, BP Defendants did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the BP Oil Spill.

32. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had revealed the actual rate of oil leakage to be 4,200,000 gallons per day and that the total oil leakage could reach 100,000 barrels.

33. The flow of oil continued unabated, and the BP Oil Spill made landfall on April 30, 2010, and has continued to have negative repercussions on the Gulf Coast.

34. The BP Oil Spill created an oil slick with a range of thousands of miles and thick voluminous plumes of oil in the deep waters within the Gulf of Mexico.

35. As the oil from the BP Oil Spill made landfall along the Gulf Coast, it infiltrated and has continued to infiltrate the delicate wetlands and intertidal zones that protect the coasts of

Louisiana, Mississippi, Alabama, Texas and Florida, requiring clean up.

36. Oil flowed into the Gulf of Mexico for eighty-six (86) days following the *Deepwater Horizon* explosion, dumping an estimated 200 million gallons of crude oil into sensitive coastland and intertidal ecosystems.

37. BP Defendants finally capped the well on July 15, 2010, almost four months after the explosion and fire on the *Deepwater Horizon.*

38. After the Oil Spill, the United States Coast Guard formally and/or informally designated, inter alia, Defendants BP Exploration, Transocean Offshore, Transocean Deepwater, and Transocean Holdings as "responsible parties" under the OPA.

39. The OPA imposes liability upon a "responsible party for a … facility from which oil is discharged … into or upon navigable waters or adjoining shorelines" for the damages that result from such incident or removal costs. 33 U.S.C. § 2702.

40. The crude oil that leaked from the *Deepwater Horizon* and associated well carried with it significant public health risks. Crude oil contains many highly toxic and hazardous chemicals that can damage every system in the human body.

41. In the wake of the disaster, and pursuant to its duties and responsibilities under the OPA, BP Defendants began implementing a response and containment plan.

**BP Oil Spill**
Deepwater Horizon

42. BP Oil Spill includes the events, actions, inactions, and omissions leading up to and including:

    i.   The blowout of the Macondo Well which was drilled by the Transocean Marianas and DHR on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana;

8

ii.  The explosions and fire on board the DHR on or about April 20, 2010;

iii.  The sinking of the DHR on or about April 22, 2010;

iv.  The release of oil, other hydrocarbons, and other toxic substances from the Macondo Well and/or the DHR and its appurtenances;

v.  The efforts to contain the Macondo Well; and

vi.  Response activities performed by clean-up workers under the direction of Unified Command.

43. On or about December 9, 1998, predecessors to all BP Defendants[1] and all Transocean Defendants[2] entered into a contract for the construction, use, and operation of the DHR.

44. BP Defendants were the operators of the Macondo Well under federal regulations of the Minerals Management Service ("MMS"), and, therefore it was the entity the lessee(s) designated as having control or management of operations.

45. As operators and primary leaseholders, BP Defendants were responsible for but not limited to assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining, and overseeing the projects contractors, and working on various aspects of the well and drilling operations.

<u>BP Toxic Chemicals</u>

46. For purposes of this complaint, crude oil, hydrocarbons, benzene, or products containing benzene, released in unprecedented amounts from the Macondo Well and the DHR explosion, will collectively be known as "BP Toxic Chemicals."

---

[1] The phrase "BP Defendants" is used hereinafter to refer to BP Exploration & Production, Inc. and BP America Production Co. collectively.
[2] Like the phrase "BP Defendants" before it, the phrase "Transocean Defendants" is used hereinafter to collectively refer to the various Transocean entities cited above.

47. Crude oil contains benzene and other volatile organic compounds such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc, all of which cause severe harm to human health.

48. Chemicals such as benzene, PAHs, and many other chemicals in crude oil are toxic, and move from the oil into the air. Once airborne, these chemicals and fugitive emissions, with pungent petroleum like odors, can blow over the ocean for miles, reaching communities far from the location of the spill.

49. According to the Agency for Toxic Substances and Disease Registry, which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

50. A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and cancer.

<u>Toxic Dispersants</u>

51. Aside from BP Toxic Chemicals, BP Defendants purchased highly noxious chemical dispersants from Nalco and/or its subsidiaries and sprayed them as part of the response

activities performed in the clean-up efforts. These dispersants include Corexit EC9500A and Corexit EC9527A (hereafter "Toxic Dispersants").

52. The Material Safety Data Sheet ("Data Sheet")[3] for Corexit EC9500 indicates that it contains hazardous substances; it is harmful to human health; and that dermal exposure, inhalation, and ingestion should be avoided. The Data Sheet further states that Corexit EC9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled. If ingested, it may cause chemical pneumonia.

53. Corexit EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness.

54. On or about April 23, 2010, BP Defendants and/or their agents began applying Toxic Dispersants to the oil on the surface of the Gulf of Mexico. Toxic Dispersants were sprayed onto the ocean surface from aircrafts that flew over areas saturated with oil and dispensed chemicals from cargo holds, fountain type jets on the decks of boats, and smaller vessels onto the surface of the water. Toxic Dispersants were also injected immediately below the surface of the water from vessels, deep below the surface of the ocean, and even sprayed by hand. These Toxic Dispersants were sprayed day and night, exposing anyone near the coastal areas, despite warnings not to.

55. On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator

---

[3] A form that sets forth the properties of a particular substance, including its toxicity and health effects.

directed BP Defendants within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than the Corexit dispersants BP Defendants had been using.

56. On May 20, 2010, BP Defendants objected to changing dispersants and notified the EPA that it would continue using Corexit.

57. BP Defendants use of chemical dispersants skyrocketed: on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

58. On May 26, 2010, the EPA directed BP Defendants to reduce overall use of Corexit by 75%. The May 26, 2010 EPA directive also required BP Defendnats to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On-Site Coordinator.

59. Since the May 26, 2010 EPA directive, BP Defendants have sought more than 40 exemption requests to use chemical dispersants on the surface and subsea in the Gulf of Mexico.

60. According to the BP *Deepwater Horizon Gulf Study*, funded by BP Defendants themselves, and based on the health effects of zone residents and clean up workers around the BP Oil Spill, the toxic effects on the human body are 52 times more toxic when Corexit and crude oil are combined.

61. The Toxic Dispersants used by BP Defendants are known to cause, inter alia, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

62. BP Defendants and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

Decedent

63. At all times relevant, Decedent resided at 26230 Fish Trap Road in Baldwin County, Alabama.

64. Following the April 20, 2010 BP Oil Spill, decedent was continuously exposed to BP Toxic Chemicals and BP Toxic Dispersants during the course of her everyday life. While domiciled on the water's edge of Wolf Bay, Alabama, decedent was constantly exposed to the pungent smell of oil in her breathing air, which would often make decedent lightheaded and nauseated. Crude oil would also wash onto decedent's dock and property where it remained for approximately a year. Decedent also came into dermal contact with crude oil and tarballs that would wash up on her property, requiring remedial attention. Additionally, decedent was exposed recreationally as she would catch and consume potentially contaminated seafood, paddle boat in the tainted Gulf waters and walk on the beach without any warning not to do so.

65. After Decedent's constant exposure to BP Toxic Chemicals and BP Toxic Dispersants, decedent suffered permanent injuries and was first diagnosed with Metastatic Adenocarcinoma Consistent with Colorectal Primary on July 17, 2018.

66. Decedent passed away from her Metastatic Adenocarcinoma Consistent with Colorectal Primary on September 7, 2018.

67. Decedent's constant exposure to BP Toxic Chemicals and BP Toxic Dispersants was sufficient to be the legal and proximate cause of Plaintiff's manifestation of Metastatic Colon Cancer, which ultimately resulted in her death. *See Industrial Union Dep't AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980) (finding a link between benzene, one of the *BP Toxic Chemicals*, and cancer).

## CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF- NEGLIENCE RESULTING IN WRONGFUL DEATH UNDER GENERAL MARITIME LAW**

68. Plaintiff incorporates and re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here, and further alleges: Defendants were negligent in their involvement in the BP Oil Spill, which dispersed the BP Toxic Chemicals and BP Toxic Dispersants that caused decedent to manifest the Metastatic Colon Cancer which ultimately resulted in the death of the Decedent. Thus, entitling Plaintiff, to bring this wrongful death action under general maritime law.

69. Defendants owed the following duties to Decedent:

    i.    A duty to warn decedent, public officials, and government agencies of the harmful effects of BP Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

    ii.    A duty to properly warn decedent to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill, including relief efforts because of the great danger associated with exposure to BP Toxic Chemicals and Toxic Dispersants;

    iii.    A duty to implement a mechanism to ensure the continued safety of decedent when safety issues arose, such as but not limited to, foreseeable injuries;

    iv.    A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

    v.    A duty to ensure that Toxic Dispersants were sprayed safely to avoid contact with people, including decedent, and in a manner that would assure decedent's health and safety;

vi.   A duty to coordinate and conduct aerial spraying in a manner so as to eliminate the risk to decedent from being exposed to BP Toxic Dispersants;

vii.   A duty to maintain, monitor, and operate, the DHR in a reasonably safe manner so as not to avoid harm to foreseeable Plaintiffs like decedent.

viii.   A duty to inspect the BOP to ensure that it was not faulty and would not fail during reasonable use so as not to avoid harm to foreseeable Plaintiffs like decedent.

ix.   A duty to properly produce, manufacture and inspect cement slurry mixture before use so as not to avoid harm to foreseeable Plaintiffs like decedent.

x.   A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to decedent.

70. Defendants breached their duty of care to decedent when they:

i.   Failed to warn decedent of the harmful effects of BP Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, the naturally occurring component in crude oil, which came into contact with decedent's person and the local environment;

ii.   Failed to properly warn decedent to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill and relief efforts, despite the great dangers associated with exposure to BP Toxic Chemicals and Toxic Dispersants;

iii.   Failed to implement a basic mechanism to ensure the continued safety of decedent, by allowing the spraying of Toxic Dispersants in the vicinity of decedent and comparator Gulf Coast residents;

iv.   Failed to abide by the provisions of the National Contingency Plan relating to the

use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

v.      Failed to ensure that Toxic Dispersants were sprayed in a manner that would avoid contact with decedent and in a manner that would ensure decedent's health and safety;

vi.      Failed to coordinate and conduct aerial spraying in a manner so as to eliminate the risk to Plaintiff from being exposed to BP Toxic Dispersants;

vii.      Failed to maintain, monitor, and operate, the DHR in a reasonably safe manner so as not to avoid harm to foreseeable Plaintiffs like decedent;

viii.      Failed to inspect the BOP to ensure that it was not faulty and would not fail during reasonable use so as not to avoid harm to foreseeable plaintiffs like decedent;

ix.      Failed to properly produce, manufacture and inspect cement slurry mixture before use so as not to avoid harm to foreseeable plaintiffs like decedent;

x.      Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to decedent.

71. The existence and breach of these legal duties are established under the General Maritime Law. The blowout and explosions on the DHR, its sinking and the resulting Spill, and the BP Toxic Chemicals and BP Toxic Dispersants that were released in unprecedented amounts thereafter, were caused by the joint and concurrent negligence of Defendants.

72. On September 4th, 2014, Judge Barbier issued findings of facts and conclusions of law and found that BP's conduct was reckless, Transocean's conduct was negligent, and Haliburton's conduct was negligent; and that each were liable under general maritime law for the blowout, explosion, and subsequent oil spill from the *Deepwater Horizon* Incident.

73. The aforementioned Defendants' negligence ultimately resulted in: (1) the mass release of BP

Toxic Chemicals; and (2) substandard remedial efforts utilizing BP Toxic Dispersants, which, after constant exposure for years at her domicile, directly and proximately caused decedent to manifest Metastatic Adenocarcinoma Consistent with Colorectal Primary on July 20, 2018, which ultimately resulted in her death on September 7, 2018.

74. As a direct and proximate result of Defendants' breach of their above-mentioned duties, Decedent suffered injury, loss, damages and ultimately resulted in her death.

## SECOND CLAIM FOR RELIEF- GROSS NEGLIENCE RESULTING IN WRONGFUL DEATH UNDER GENERAL MARITIME LAW

75.    Plaintiff incorporates and re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

76.    Plaintiff claims that Defendants were grossly negligent in their involvement in the DHR explosion, the aftermath of which ultimately resulted in his injuries.

77.    At all times material hereto, Defendants' owed duties of ordinary and reasonable care to Decedent in connection with the manufacture, maintenance, and operation of the DHR, and additionally owed and breached duties to Decedent to guard against the and/or prevent the risk of the BP Oil Spill which occurred herein. The existence and breach of these duties are established under General Maritime Law.

78.    Defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the BP Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline and to clean up the damage caused to date, including the use of Nalco's chemical dispersants. Defendants owed and breached a duty to Decedent as well as to all persons who might foreseeably be harmed to exercise due care in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures. The existence and breach of these legal duties are established under General Maritime Law.

17

79.   Defendants breached their legal duty to Decedent and failed to exercise reasonable care and acted with reckless, willful and wanton disregard in the negligent failure to contain the BP Oil Spill.

80. On September 4th, 2014, Judge Barbier found that BP's conduct was reckless and that BP was liable under general maritime law for the blowout, explosion, and subsequent oil spill from the *Deepwater Horizon* Incident.

81. On September 4, 2014, Judge Barbier made the finding that the discharge of oil from the *Deepwater Horizon* Incident was the result of BP Defendants' gross negligence and willful misconduct.

82. Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause Decedent's injury and/or property damage.

83. At all relevant times to this litigation, Defendants knew or should have known that:

    i.   Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

    ii.   Chemical dispersants contain hazardous chemicals that are deleterious to human health and the environment;

    iii.   Plaintiffs should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which were being released into the environment; and

    iv.   Plaintiffs should wear proper protective clothing and respirators when in close proximity to the above mentioned hazardous and toxic substances.

84. As a direct and proximate cause of Defendants' wanton or reckless acts, Decedent suffered

physical injuries ultimately resulting in her death. Defendants' wanton or reckless conduct and reckless indifference described herein entitles Plaintiff to punitive damages. The amount of punitive damages recoverable by Plaintiff is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of same; sufficient to both punish Defendants and deter similar wrongdoing in the future.

**THIRD CLAIM FOR RELIEF-NEGLIGENCE RESULTING IN WRONGFUL DEATH UNDER ALABAMA LAW**

85. Plaintiff incorporates and re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here, and further alleges:

86. At all times material hereto, Defendants owed duties to Decedent,[4] and all comparator plaintiffs, and breached said duties to Decedent,[5] and all comparator plaintiffs.

87. The existence and breach of these legal duties are established under Alabama law. The blowout and explosions on the DHR, its sinking and the resulting Spill, and the BP Toxic Chemicals and BP Toxic Dispersants that were released in unprecedented amounts thereafter, were caused by the joint and concurrent negligence of Defendants.

88. The aforementioned Defendants' negligence ultimately resulted in: (1) the mass release of BP Toxic Chemicals; and (2) substandard remedial efforts utilizing BP Toxic Dispersants, which, after constant exposure for years at her domicile, directly and proximately caused decedent to manifest Metastatic Adenocarcinoma Consistent with Colorectal Primary on July 20, 2018, which ultimately resulted in her death on September 7, 2018.

89. As a direct and proximate result of Defendants' breach of their above-mentioned duties, decedent suffered injury, loss, damages and ultimately resulted in her death.

---

[4] *See* ¶ 69
[5] *See* ¶ 70

90.  Plaintiff claims damages under the Alabama Wrongful Death Act, Alabama *Code, 1975,* §

6-5-410, against Defendants, for their wrongful acts, omissions, and/or negligence which

proximately caused the Plaintiff's Decedent's death.

**PRAYER FOR RELIEF**

91. Plaintiff LEAH MEGAN LANGLEY demands judgment against Defendants and prays for the

following relief:

On behalf of the Plaintiff and other Survivors (Robbin Kessler And Emily Allison)

a.  Pecuniary damages under General Maritime Law in amounts to be determined at

trial, including:

1. Loss of financial support;
2. Loss of services;
3. Loss of society
4. Loss of nurture;
5. Loss of fringe benefits
6. Other pecuniary damages allowed under General Maritime Law

b.  Survival damages under General Maritime Law on behalf of the Estate in amounts

to be determined at trial, including:

1. Pre-death pain and suffering;
2. Mental anguish prior to death;
3. Medical expenses;
4. Funeral expenses;
5. Loss of wages prior to death; and
6. Loss of future earning capacity;
7. Other survival damages allowed under General Maritime Law.

c.  Damages under Ala. Code § 6-5-410 including punitive damages in an amount to
be determined at trial.

d.  Plaintiff also demands an award of costs as allowed by law.

92.  Plaintiff requests a trial by jury.

WHEREFORE, Plaintiff prays that the Defendants be duly cited to appear and answer this Complaint and that this Honorable Court grant Plaintiff relief to which she is entitled to, under the  law, and against BP Defendants, including court costs and attorney's fees.


Respectfully Submitted,

**THE DOWNS LAW GROUP, P.A.**

/s/ Charles D. Durkee
**CHARLES D. DURKEE # 998435**

3250 Mary Street, Suite 307

Coconut Grove, FL 33133

Telephone: (305) 444-8226

Facsimile: (305) 444-6773

Email: ddurkee@downslawgroup.com

*Attorney for Plaintiff*

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct going of the foregoing instrument was filed with the Clerk of Court by using the CM/ECF system. Notice of this filing will be sent to all counsel of  record registered to receive electronic service by operation of the Court's electronic filing system.

Dated this 4th of September 2020

_/s/ Charles D. Durkee_
Charles D. Durkee, Esq.